UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

SUZANNE SULLIVAN, Regional Director of Region 22 of the National Labor Relations Board For and on behalf of the National Labor Relations Board

    Petitioner,

v.

HSA CLEANING INC.,

    Respondent.

Civ. No. 23-2994 (KM)(JBC)

OPINION

**KEVIN MCNULTY, U.S.D.J.:**

    Presently before the Court is the petition of Suzanne Sullivan, the Regional Director of Region 22 of the National Labor Relations Board ("Petitioner" or "Board"), brought pursuant to Section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j) (the "Act"), for temporary injunctive relief pending the final disposition of the matters pending before the Board on a charge against HSA Cleaning Inc. ("Respondent" or "HSA"). The Board contends that HSA has engaged in, and is currently engaging in, conduct in violation of Sections 8(a)(1) and (3) of the Act.

    For the reasons expressed below, the Board's petition for injunctive relief is **GRANTED**.[1]

---

[1]     Also pending are (a) the Board's motion to try the petition for temporary injunction on the basis of the record developed before the Board's administrative law judge and affidavits completed as part of the Board's administrative investigation (DE 2); (b) the Board's motion for a protective order requiring the parties to redact identifying information from affidavits and documentary evidence submitted to the Court (DE 3); and (c) the motion of Service Employees International Union Local 32BJ (the "Union") to appear amicus curiae (DE 6, 16). All motions are granted.

    With respect to the first motion, I find that trying the petition on the basis of the administrative and investigative record is appropriate here given the Court's limited

## I. FACTUAL BACKGROUND[2]

Respondent HSA is a commercial cleaning company. The unfair labor practice proceeding underlying this petition is related to HSA's termination of

---

fact-finding function on a Section 10(j) petition: *i.e.,* to determine whether there is reasonable cause to believe the Respondent violated the National Labor Relations Act, not to resolve contested factual issues or the credibility of witnesses. *Balicer v. I.L.A.*, 364 F. Supp. 205, 225-226 (D.N.J. 1973), *aff'd. per curiam* 491 F.2d 748 (3d Cir. 1973). Indeed, district courts considering a Section 10(j) petition commonly base their reasonable cause determinations on evidence presented in the form of affidavits or administrative hearing transcripts. *See, e.g., Eisenberg v. Honeycomb Plastics Corp.*, 1987 WL 10908, at *1 (D.N.J. 1987); *Eisenberg v. Tubari, Ltd., Inc.*, 1985 WL 32832, at *1, 3 (D.N.J. July 8, 1985). I also note that HSA has not opposed this motion and it has itself relied on the administrative and investigative record to make its case in response to the Board's petition. The Board's motion to try the petition on the basis of sworn affidavits and the administrative record (DE 2) is therefore GRANTED.

As to the second motion, I find that a protective order requiring the parties to redact names and identifying information of HSA employees from all affidavits and documentary evidence submitted to the Court is appropriate and necessary to protect the employees' confidential cooperation with the Board's investigation and administrative process, as well as to protect the witnesses from possible retaliation by their employer. Moreover, such identifying information will be of no particular value to the Court in deciding the petition, and HSA has not opposed the motion in any event. The Board's motion for a protective order requiring the parties to redact identifying information in affidavits and documentary evidence (DE 3) is therefore GRANTED.

As to the third motion, I find that participation of the Union as amicus curiae will allow for a complete presentation of the issues before the Court and will assist the Court in its determinations. The Board and HSA do not oppose this motion. The Union's motion to participate as amicus curiae (DE 6, 16) is therefore GRANTED.

[2] Certain citations to record are abbreviated as follows:

"DE" = Docket entry number in this case

"Pet. Br." = Petitioner's Memorandum of Points and Authorities in Support of Petition for Injunction under Section 10(j) of the National Labor Relations Act (DE 1-6)

"Resp. Br." = Respondent's Memorandum of Law in Opposition to Petition for Protective Restraining Order under Section 10(j) of the National Labor Relations Act (DE 11)

"Pet. Reply" = Petitioner's Reply to Respondent's Opposition to the Petition for Section 10(j) Injunctive Relief (DE 13)

"Tr." = Administrative hearing transcript (DE 2-2 to 2-4)

two employees: Luis Varela and Jose Teran. The Board contends that HSA terminated Varela and Teran because they assisted Service Employees International Union Local 32BJ ("Union") in organizing HSA's employees and engaged in other protected concerted activity.

I summarize the pertinent facts, not as ultimate factual findings, but rather as components of the Board's showing of reasonable cause.

HSA is the cleaning contractor for the American Dream Mall ("Mall") in East Rutherford, New Jersey. (Tr. 16, 187.) In spring 2022, HSA employed about 150 cleaners who worked on three shifts: first shift from 7:00 am to 3:30 pm; second shift from 3:00 pm to 11:30 pm; and third shift from 11:00 pm to 7:30 am. (Tr. 194–96.)

In March 2022, Teran spoke on behalf of other employees at a meeting with Drew Padell, HSA's director of operations, and Shirley Cabrera, HSA's assistant director of operations. (Tr. 101, 133–34, 186, 293.) The meeting concerned employee grievances, such as mistreatment from supervisors and threats of being fired. (Tr. 133–34.)

In June 2022, members of the Union visited the Mall and spoke with workers about joining the Union. (Tr. 154–56.) On June 14, 2022, Varela met with Lisa McAllister, a Union representative, in the Mall's food court to discuss how the Union may benefit the employees. (Tr. 40–41.) Also around mid-June, Claudio Saldaña, a Union organizer, approached Teran at the Mall, spoke about the Union, and handed him his business card. (Tr. 135–36, 157.) Teran then showed the business card to Gloria Castellanos, the housekeeping supervisor, and Elita Brito, the first shift supervisor. (Tr. 111, 114–16.) A couple of days later, Castellanos told her boss that the Union had visited the Mall. (Tr. 118–19.) That same week, Teran discussed the Union with about six or seven of his coworkers, including Varela. (Tr. 139–40.) Teran then contacted Saldaña and advised him that several coworkers were interested in the Union. (*Id.*)

On June 21, 2022, Cabrera reinforced to the first shift employees that their shift hours are from 7:00 am to 3:30 pm. (Tr. 44–45.) However, the next

3

day, Brito attempted to start a morning meeting about 5 to 10 minutes early. (Tr. 42, 342.) Based on Cabrera's reminder the day before, Varela told Brito that they could not start the meeting early because their shift did not begin until 7:00 am. (Tr. 342.) Varela also suggested that employees leave ten minutes early if the meeting started ten minutes early. (Tr. 42–44.) Instead, Brito waited until 7:00 am to start the meeting. (Tr. 342–43.) Brito then told Cabrera what had happened and memorialized the event in her daily shift report: "Everyone arrived on time and was at the meeting. In the morning, I wanted to start the meeting five minutes before 7 a.m. but Luis Varela objected because he said it was not yet time." (Tr. 257–58.) Cabrera reprimanded Varela for disrespecting Brito by not allowing her to start the meeting early. (Tr. 45–46, 342–43.) Cabrera told Varela that preferential treatment, such as the ability to buy coffee during the shift, would end. (Tr. 44–46).

Following his meeting with Cabrera, Varela contacted the Union officials to meet later that evening. During their meeting, Varela spoke about his earlier meeting with his supervisors and discussed other employee concerns. (Tr. 49–50.) Saldaña advised Varela to speak with his coworkers with the goal of gathering signatures for a petition to let HSA know about the employees' interest in the Union. (Tr. 51–52.) Varela began contacting his coworkers that same evening. (Tr. 52.) Varela also planned to meet with Saldaña at the Mall the next day. (Tr. 58.)

The next day, June 23, 2022, Varela discussed the Union with other employees at the Mall. (*Id.*) However, later that morning, a coworker warned Varela that HSA was looking for an excuse to fire him. (Tr. 55–56.) The coworker also told Varela that Padell and Cabrera wanted to know if the Union had been at the Mall on their own accord or if an employee had asked them to come. (Tr. 56, 97–98.) In response to the coworker's warning, Varela canceled his meeting with Saldaña. (Tr. 57–58.) Teran also testified that a coworker had separately warned him about HSA looking for an excuse to fire him and Varela. (Tr. 143).

4

Three days later, on June 26, 2022, HSA terminated Varela's and Teran's employment. Each received a separate text message from Cabrera stating: "[T]he company has performed some evaluations and decided to go in another direction and [terminate] your services. Thank you for the time and the effort." (Tr. 59, 142–43.) Teran and Cabrera met two days later to discuss his termination and, other than Cabrera stating that he was fired for "one thing after another, and another, and another," Cabrera did not provide a specific explanation. (Tr. 144–45, 151.) HSA contends that Varela and Teran were terminated for poor performance. However, prior to their terminations, Varela and Teran had not been written up or disciplined. (Tr. 59–60, 146, 253–54.) Notably, in February 2022, HSA offered Varela a promotion to third shift supervisor, which Varela turned down due to a scheduling conflict with his other job. (Tr. 64–65, 200–01, 393.)

HSA also contends that Varela and Teran were terminated as part of a reduction in force. In March or April 2022, the Mall informed HSA of the need to reduce total annual work hours from 260,000 to 219,000. (Tr. 263, 364.) To do so, HSA eliminated the third shift, which resulted in twenty-five cleaners resigning or moving to another shift. (Tr. 195–96.) Certain full-time workers were also informed they could only work part-time hours, which resulted in additional employees resigning. (Tr. 196–97.) HSA then terminated five additional employees, including Teran and Varela, using work performance as the guiding metric. (Tr. 197–99, 294, 329.) HSA hired two additional employees after the reduction in force, one on July 1 and the other on August 25, 2022. (GC Ex. 16–17.)

Following the terminations of Varela and Teran, several employees expressed to Saldaña that, while they sympathized with Varela and Teran, they did not want to be fired next or have their names associated with the Union. (DE 2-6 para 9–10.) In mid-July 2022, Saldaña, accompanied by Varela, entered HSA's office and gave Padell his business card and a signed petition seeking to reinstate Varela and Teran. (Tr. 233–34.) Padell contends that this

5

was the first time he became aware of the Union's interest in organizing the employees. (Tr. 234–35.)

On March 22, 2023, the Board issued a first amended complaint and notice of hearing against HSA in Case 22-CA-298853, alleging that HSA committed unfair labor practices under Sections 8(a)(1) and (3) of the Act. An administrative hearing commenced before Administrative Law Judge Jeffrey Gardner beginning on April 18 and concluding on April 27, 2023.

On June 1, 2023, the Board petitioned this Court, pursuant to Section 10(j) of the Act, for temporary injunctive relief, including (1) an order requiring HSA to cease and desist from (a) discharging or discriminating against employees engaging in union or protected concerted activity and (b) unlawfully interfering with employees exercising their rights under Section 7 of the Act; (2) reinstating Varela and Teran and expunging their discharges from their records; and (3) informing employees about the requirements in any resulting injunction order via meetings, text message, mail, and posting at HSA's New Jersey facility. (DE 1; Pet. Br.) On June 20, 2023, HSA filed a brief in opposition to the Board's petition for temporary injunctive relief. (DE 11.) On June 29, 2023, the Court held a show-cause hearing on the Board's petition. (DE 18.)

## II. LEGAL STANDARD

Section 10(j) of the Act empowers the National Labor Relations Board or its designated agent to seek interim injunctive relief from a federal district court pending the Board's own administrative adjudication of unfair labor practice proceedings. *See* 29 U.S.C. § 160(j). A district court's determination whether to issue temporary injunctive relief under § 10(j) involves a two-step inquiry. First, the district court must decide whether there is reasonable cause to believe that an unfair labor practice has occurred. *See Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247 (3d Cir.1998); *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 877 (3d Cir.1990). This prong of the test is satisfied when, viewing the facts most favorably to the Board, there is sufficient evidence to support the legal theory of violation presented by the Regional Director, and

when that theory is substantial and not frivolous. *See Eisenberg v. Lenape Products, Inc.*, 781 F.2d 999, 1003 (3d Cir.1986). Second, having found "reasonable cause," the district court must find that the issuance of an injunction is "just and proper," i.e., that it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board. *See id.*; *Dorsey Trailers*, 147 F.3d at 247; *Vibra Screw*, 904 F.2d at 877. "Under this inquiry, the court determines whether an injunction is necessary to preserve the Board's remedial powers, which incorporates a weighing of relative harms to the bargaining process, employees' rights, and the likelihood of restoring the status quo absent injunctive relief, along with the public interests implicated by the labor disputes." *Chester ex rel. N.L.R.B. v. Grane Healthcare Co.*, 666 F.3d 87, 98–99 (3d Cir. 2011).

### III.   DISCUSSION

#### A. The Board Has Established Reasonable Cause to Believe HSA Has Violated the Act

##### 1. Threshold showing

The Board has satisfied its burden of establishing that there is reasonable cause to believe that HSA engaged in unfair labor practices, specifically: (1) HSA violated Sections 8(a)(1) and (3) by discharging Varela and Teran; and (2) HSA violated Section 8(a)(1) by discharging Varela in retaliation for his protected concerted activities.

The reasonable cause standard requires the district court to examine (1) whether "the Regional Director's case depends on a substantial, non-frivolous legal theory"; and (2) whether "there is sufficient evidence, taking the facts favorably to the board, to support that theory." *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076 (3d Cir. 1984). This is a "low threshold of proof," and the amount of evidence required by the reasonable cause determination "is less than that required to prove a violation." *Id.* (citing *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 905–06 (3d Cir. 1981)).

7

The Board has overcome that low threshold of proof. As discussed above, the Board's evidence supports that Varela and Teran engaged in union activity by, *inter alia*, meeting with Union representatives and discussing supporting the Union with coworkers. Varela also engaged in protected activity when he objected to a supervisor beginning a meeting early. The close timing between the Union entering the workplace and HSA's termination of Varela's and Teran's employment suggests that their terminations were motivated by their union activity. The evidence also sufficiently suggests that HSA had knowledge of Teran's and Varela's interactions with the Union. For instance, Teran testified that he showed a Union representative's business card to his supervisors, and Varela and Teran received warnings from coworkers that HSA was looking to terminate their employment. The Board has also put forward evidence of the chilling effect that these alleged actions appear to have had on other employees' support for the Union.

In sum, the record compiled at the hearing sets forth reasonable cause to believe that HSA's actions constituted an unfair labor practice.

HSA nevertheless contends, however, that the Board has not met its burden because the Board's allegations are frivolous and either unsupported or contradicted by the record, and because HSA lawfully terminated Varela and Teran. Neither of those arguments succeeds.

### 2. **HSA's objection that the allegations are frivolous and are not supported by the record**

HSA raises several challenges to the adequacy of the evidence presented at the administrative hearing.

*First*, HSA asserts that it had no knowledge of Varela's or Teran's Union activity. (Resp. Br. 8.) For support, HSA emphasizes that there is no direct evidence that any HSA employee or supervisor witnessed Varela's or Teran's encounter with the Union representatives at the Mall. Even assuming *arguendo* that no HSA employee witnessed or heard about those meetings, there is other evidence in the record which establishes HSA's knowledge of union activity. Teran testified that he showed a Union organizer's business card to two

8

supervisors, Castellanos and Brito. (Tr. 111, 114–16 136–38.) Castellanos testified that, shortly after the business-card interaction, she advised her boss that the Union had visited the Mall. (Tr. 118–19.) HSA asserts that this evidence is fictitious and fabricated because Brito categorically denied the encounter, the Board failed to call as a witness another coworker who was present, and Castellanos was an unreliable witness. (Resp. Br. 9–10.) At this stage, it is not this Court's role to resolve issues of witness credibility or disputes of fact. See *Kendellen v. Evergreen Am. Corp.*, 428 F. Supp. 2d 243, 250 (D.N.J. 2006) (citing *Schauffler v. Local 1291, Int'l Longshoremen's Ass'n*, 292 F.2d 182, 186 n. 4 (3d Cir.1961)). Instead, I must view the facts most favorably to the Board, and, viewed in that light, the evidence presented is sufficient to satisfy the Board's burden.

*Second*, HSA calls into question the reliability of the two warnings: (1) that HSA was looking for an excuse to fire Varela and Teran and (2) that HSA was looking for the employee who brought the Union into the Mall. As to the first warning, HSA argues that the coworker who reported it was a close friend of Varela and Teran and lacked firsthand knowledge of the warning or management's intentions. HSA also asserts that the coworker with whom the warning allegedly originated denied making it. As to the second warning, HSA asserts that Varela lied about the source of the warning, which calls into question his credibility as a witness. (Resp. Br. 15–16.) Again, HSA's arguments rest on resolving disputes of fact and making credibility determinations. During the administrative hearing, Varela and Teran testified that they were warned that HSA was looking for a reason to terminate them three days before they were terminated. That, along with the other evidence in the record, is sufficient to satisfy the Board's burden at this stage.

*Third*, HSA raises factual disputes surrounding the meeting on June 22, 2022. HSA asserts that Cabrera had already stated her intention to terminate employee coffee breaks earlier in 2022 (i.e., not in retaliation for the June 22 events), and did not reprimand Varela in relation to the June 22 meeting. (Resp. Br. 11–14.) I note that HSA does not dispute that Brito attempted to

9

start the June 22 meeting five to ten minutes early, that Brito memorialized Varela's objection to starting the meeting early in her daily shift report, or that Cabrera brought Varela's objection to Padell's attention. (Resp. Br. 12–13; *see* GC-18.). That undisputed evidence, along with the other evidence in the record, is sufficient to satisfy the Board's theory that Varela's termination on June 26 was in retaliation for protected concerted activity during the June 22 meeting.[3]

Weighing all of the evidence together, I find reasonable cause to believe that HSA has violated the Act.

### 3. HSA's objection that Varela and Teran were terminated for good cause and not in violation of Sections 8(a)(1) and (3)

HSA asserts that "no truly credible evidence has been presented to demonstrate any link between [Varela's and Teran's] role[s] as Union supporters and their termination[s]." (Resp. Br. p. 17.) I conclude that there is sufficient evidence in the record to connect Varela's and Teran's support for the Union with their terminations. HSA terminated Varela and Teran about two weeks after they began meeting with the Union. During that interim period, Varela and Teran spoke with their coworkers about supporting the Union; Teran showed his supervisors the Union representative's business card; Varela and Teran were told that HSA was looking for a reason to fire them; and Varela was warned that HSA was attempting to find out who brought the Union into the Mall.

However, HSA proffers that it terminated Teran and Varela for poor work performance and as part of a reduction in force. (Resp. Br. pp. 17–23.) The Board responds that HSA's asserted reasons for terminating the employees are pretextual. (Pet. Reply pp. 2–3.) At the outset, HSA terminated both employees

---

[3] HSA also contends that there is no evidence that Teran was terminated for his statements during the March 2022 meeting or that anyone at HSA harbored any animus towards Teran because of his statements. (Resp. Br. 14–15.) Based on the Board's submissions, it is not seeking a determination that Teran was terminated based on the March 2022 meeting. Therefore, I need not consider this argument.

10

via a vague text message, which simply stated: "[T]he company has undertaken evaluations and has decided to go in another direction and terminate your services." (GC Ex. 7) When Teran met with Cabrera to discuss his termination, he was told only that he was fired for "one thing after another, and another, and another," with no further elaboration. (Tr. 144–45, 151.) Additionally, the Board has presented evidence contradicting the allegations of poor work performance. As discussed, *supra*, Varela and Teran were never written up or disciplined for their alleged performance issues and Varela was offered a supervisory position just a few months before his termination. Those facts distinguish this case from *Fiesta Hotel Corp.*, on which HSA relies, where the employee admitted that he received verbal counseling for refusing to follow directions and had a "cumulative record of misconduct and complaints against him." 344 NLRB 1363, 1365–66 (2005). Moreover, HSA hired two new employees shortly after its alleged reduction in force; HSA's counsel proffered an explanation, but the finder of fact would not necessarily be required to accept it. Thus, HSA's asserted defenses do not overcome the evidence in the record that the Board has reasonable cause to believe that HSA violated the Act with respect to the terminations of Varela and Teran.

### B. The Board Has Established that the Injunction Sought is Just and Proper

The Board has also met its burden of demonstrating that injunctive relief is "just and proper." Injunctive relief is just and proper under Section 10(j) when "the alleged unfair labor practices," by their nature, "are likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo." *Vibra Screw*, 904 F.2d at 878. To put it another way, the Board must demonstrate that, assuming it prevails on the merits, remedial efforts by the Board would by then be impaired or ineffective. *See id.* at 878–79 (10(j) injunctive relief is appropriate where "the chilling effect of management retaliation may outlast the curative effects of any remedial action the Board might take"). In *Vibra Screw,* the Court stated that "[b]ecause the 'just and proper' inquiry must

11

recognize the public interest implicit in protecting the collective bargaining process, the critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired." 904 F.2d at 879. In granting injunctive relief, however, the Court must maintain a sense of proportion, remaining mindful that "the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power." *Suburban Lines*, 731 F.2d at 1091.

     HSA argues that the Board's delay in filing this petition weighs against any finding that emergent, injunctive relief is necessary. (Resp. Br. pp. 28–30.) HSA also argues that the Board's application seeks an individual remedy in contravention of the Act, and that injunctive relief is not needed to protect the efficacy of any final order entered in the underlying administrative proceeding or to preserve the status quo. (Resp. Br. at 25–28.)

     It is true that delay can, under certain circumstances, indicate that emergent relief is unnecessary, but the time factor does not outweigh the need for relief here. "When reviewing the amount of time the Board takes to file a section 10(j) 'there is a certain amount of leniency that the Board must be afforded, stemming from the deference to the Board that is built into the statutory scheme.'" *Hirsch v. Konig*, 895 F. Supp. 688, 697 (D.N.J. 1995) (quoting *Vibra Screw*, 904 F.2d at 881). As the Court explained in *Hirsch*, the Board "must engage in careful investigation and deliberation before it petitions the court for 10(j) relief." *Id.*

     But even setting aside deference to the Board's investigative processes, I would find injunctive relief to be just and proper here. After Varela and Teran were terminated, several employees declined to support the Union, citing fear of losing their jobs. To overcome that evidence of a chilling effect, HSA submits a copy of a petition signed by HSA employees in March 2023 stating that the employees have come together with the Union "to demand improvements to our wages, benefits, and working conditions." (Resp. Br. Ex. 4.) However, the petition is signed by sixty-four individuals, only forty-three of whom were

12

current employees, and the petition says nothing about whether other employees still fear retaliation, hindering the Union's ability to organize. *See Vibra Screw*, 904 F.2d at 880. Additionally, the Board's application for an order to reinstate Varela and Teran is not an individual remedy as such; rather, it is made in the public interest to remove an employer-created impediment to organization. *See Wellington Hall Nursing Home, Inc.*, 651 F.2d at 907. HSA employees knew that Varela and Teran had met with the Union and were seeking Union support. As the Third Circuit explained, "the discharge of active and open union supporters . . . risk(s) a serious adverse impact on employee interest in unionization." *Id.* (quotations omitted). I also conclude that the injunction will not impose an undue burden on HSA. HSA will be required to cease certain unlawful activities, reinstate Varela and Teran, and ensure that all HSA employees are made aware of the injunction. The injunction is also written to expire after six months, at the outside. On balance, the burden to HSA does not exceed the potential harm to the remedial powers of the Board pending its ultimate decision that HSA violated the Act, should that occur.

Having weighed the "relative harms to the bargaining process, employees' rights, and the likelihood of restoring the status quo absent injunctive relief," *see Chester*, 666 F.3d 87, 98–99, I find that the Board has satisfied its burden of establishing that injunctive relief is just and proper.

## IV. CONCLUSION

For the reasons set forth above, the Board's petition for injunctive relief is **GRANTED**. An appropriate order follows.

Dated: July 6, 2023

/s/ Kevin McNulty

**Hon. Kevin McNulty**
**United States District Judge**